**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**
**AT GREENVILLE**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 2:09-CR-045 |
| RONNIE COOPER | |

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE
## PURSUANT TO 28 U.S.C. § 2255

PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
Jaren Janghorbani
Andrew Markquart
Thomas Christman Rice
1285 Avenue of the Americas
New York, NY  10019
Telephone:  (212) 373-3000
Fax:  (212) 757-3990
jjanghorbani@paulweiss.com
amarkquart@paulweiss.com
trice@paulweiss.com

BERNSTEIN, STAIR &MCADAMS
  LLP
Nathaniel Evans
116 Agnes Road
Knoxville, TN 37919
Telephone:  (865) 546-8030
Fax:  (865) 522-8879
nevans@bsmlaw.com

LAW OFFICES OF BRYAN E. DELIUS
Bryce W. McKenzie
124 Court Avenue
Sevierville, TN 37862
Telephone:  (865) 428-8780
Fax:  (865) 428-5254
bryce@bryandelius.com

*Attorneys for Movant Ronnie Cooper*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ........................................................................................................2

    A.    Criminal Proceedings................................................................................2

    B.    Post-Conviction Investigation ...................................................................6

ARGUMENT.............................................................................................................8

    A.    Mr. Rush's Statement Should Have Been Disclosed  Because It is
        Both Exculpatory and Material....................................................................8

        1.    Mr. Rush's Statement, If Disclosed, Would Have Severely
            Undermined the Prosecution's Case. ............................................11

        2.    The Evidence Against Mr. Cooper Was Comparatively
            Weak Such that the Result Likely Would Have Been
            Different Had Mr. Rush's Statement Been Disclosed. ..................12

            a.    Jailhouse Informants ..........................................................13

            b.    Text Message Exchanges....................................................14

            c.    Recorded Phone Calls.........................................................15

            d.    Wire Transfers ...................................................................17

    B.    Mr. Rush's Statement Should Have Been Disclosed Even if It
        Could Have Been Discovered with Due Diligence. .................................19

    C.    Mr. Rush's Statement Should Have Been Disclosed Whether It
        Was Made to Police or to the Prosecutors. .................................................20

CONCLUSION..........................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*United States* v. *Bagley*,
    473 U.S. 667 (1985)..................................................................8, 9, 19

*Banks* v. *Dretke*,
    540 U.S. 668 (2004).........................................................................19

*Berger* v. *United States*,
    295 U.S. 78 (1935)............................................................................1

*Brady* v. *Maryland*,
    373 U.S. 83 (1963)........................................................................2, 8

*United States* v. *Gallo*,
    668 F. Supp. 736 (E.D.N.Y. 1987)....................................................18

*Harris* v. *Lafler*,
    553 F.3d 1028 (6th Cir. 2009)..........................................................20

*Higgins* v. *Renico*,
    470 F.3d 624 (6th Cir. 2006)............................................................19

*Kyles* v. *Whitley*,
    514 U.S. 419 (1995).....................................................................9, 18

*Strickler* v. *Greene*,
    527 U.S. 263 (1999)...................................................................1, 20

*United States* v. *Tavera*,
    719 F.3d 705 (6th Cir. 2013) ......................................2,10, 11, 19

*United States* v. *Woods*,
    26 Fed. App'x 448 (6th Cir. 2001) ..................................................15

*Zappulla* v. *New York*,
    391 F.3d 462 (2d Cir. 2004) ...........................................................13


**STATUTES**

18 U.S.C. §§ 1512–1513....................................................................3

18 U.S.C. § 1956...............................................................................3

21 U.S.C. § 841............................................................................................................2, 3

28 U.S.C. § 2255..........................................................................................................1, 21

U.S.S.G § 4B1.1(a)............................................................................................................5

Ronnie Cooper, a prisoner at the Federal Correctional Institution at Otisville, New York, respectfully submits this memorandum of law in support of his motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255.

## PRELIMINARY STATEMENT

Our system of criminal justice grants prosecutors tremendous power over the life and liberty of criminal defendants. In exchange, prosecutors are called upon to exercise this power in a manner that is consistent with the law and with their position as public servants. Thus, the Supreme Court has spoken of "the special role played by the American prosecutor in the search for truth in criminal trials," with the prosecutor being a party "whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Strickler* v. *Greene*, 527 U.S. 263, 281 (1999) (quoting *Berger* v. *United States*, 295 U.S. 78, 88 (1935)). This most basic principle broke down in the case of Ronnie Cooper. The result of this breakdown was a man being sentenced to 30 years in prison for crimes that he did not commit.

On December 21, 2010, following a jury trial in which he was tried alongside six alleged coconspirators, Mr. Cooper was convicted on several counts related to his purported involvement in a drug distribution ring based out of Johnson City, Tennessee and headed by his brother-in-law, Sunnah Maddox. While the prosecution introduced devastating evidence against each of Mr. Cooper's codefendants, the evidence admitted against Mr. Cooper was strikingly thin. And while the jury ultimately convicted all of the defendants, including Mr. Cooper, neither the jurors nor Mr. Cooper and his counsel were made privy to compelling evidence of Mr. Cooper's innocence. Through a post-conviction investigation, it has now come to light that Jamie Rush, the prosecution's star cooperating witness and a member of Sunnah Maddox's drug ring, told law

enforcement officials during pre-trial interviews that Mr. Cooper had *nothing to do* with the alleged conspiracy. Given Mr. Rush's centrality to the drug operation and his level of knowledge concerning the details of that operation, this evidence could hardly be more exculpatory. The prosecution plainly had an obligation to provide this evidence to Mr. Cooper pursuant to the rule established in *Brady* v. *Maryland*, 373 U.S. 83 (1963). Because it failed to do so, Mr. Cooper's conviction should be vacated.

This is not the first time that Assistant United States Attorney Donald Taylor has cut corners in pursuit of a conviction. In the case of *United States* v. *Tavera,* the Sixth Circuit vacated a conviction based on Mr. Taylor's failure to disclose a codefendant's statement during plea negotiations that defendant Tavera had no knowledge of the drug conspiracy in which he was accused of having participated. 719 F.3d 705 (6th Cir. 2013). The Sixth Circuit there held that the "statements to Taylor were plainly exculpatory" and that "[t]his particular case is not close." *Id.* at 708. Once again, Mr. Taylor has failed to disclose a statement from an admitted conspirator that the defendant was not a party to the conspiracy. Just as in *Tavera*, that evidence is "plainly exculpatory" and represents textbook *Brady* material that should have been disclosed. Therefore, just as in *Tavera*, this case is not close. Mr. Cooper's conviction, founded upon a blatant due process violation, cannot and should not stand.

## **BACKGROUND**

### A. Criminal Proceedings

Ronnie Cooper was charged with (1) conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 841; (2) conspiracy to distribute and possess with intent to distribute a quantity of marijuana, in violation of 21 U.S.C. § 841; (3) conspiracy to distribute and possess with

intent to distribute 50 grams or more of cocaine base (crack), in violation of 21 U.S.C.

§ 841; (4) conspiracy to commit money laundering in violation of 18 U.S.C. § 1956; and

(5) conspiracy to intimidate a witness, in violation of 18 U.S.C. §§ 1512 and 1513. (ECF

No. 398, Page ID # 2211–28.)  All of these charges related to his alleged participation in

his brother-in-law's drug ring.

Mr. Cooper was tried alongside six alleged coconspirators in a ten-day

jury trial commencing on November 29, 2010.  During those ten days, the lion's share of

the prosecution's evidence concerned the other defendants.  Most notably, Sunnah

Maddox's one-time roommate and right-hand man, Jamie Rush, took the stand in the role

of the prosecution's key witness.  Mr. Rush had been charged alongside the other

codefendants but had agreed to testify as part of a plea agreement.  During his testimony,

spanning over the course of three days, Mr. Rush offered devastating testimony against

every single defendant except Ronnie Cooper.

Through extensive and detailed testimony, Mr. Rush demonstrated himself

to be highly knowledgeable as to every aspect of Sunnah Maddox's drug operation.  Mr.

Rush testified that he lived in Mr. Maddox's Tennessee house for four years.  (Trial Tr.

1155:3–1156:20.)  Mr. Rush knew when and where Mr. Maddox's crack houses were set

up, when business was being conducted via cell phones, the source of the cocaine for the

distribution ring, and the procedure for purchasing cocaine.  (*Id.* at 1176:18–1179:20;

1180:7–24.)  He also testified that he participated in trips to purchase cocaine from the

source and that he assisted in cooking cocaine into crack.  (*Id.* at 1158:4–1159:7;

1181:17–1182:16; 1306:24–1307:3.)  He was familiar with the "supreme mathematics"

code that Mr. Maddox and defendants other than Mr. Cooper used to obfuscate the

meaning of their communications. (*Id.* at 1200:1–1201:12.) He also identified Mr. Maddox's drug ledgers and testified that he recognized every customer listed on the ledger. (*Id.* at 1333:20–1334:20.)

While Mr. Maddox was the primary subject of Mr. Rush testimony, Mr. Rush also testified as to each of the other defendants' role in the conspiracy with the exception of Mr. Cooper. Mr. Rush testified that defendants Lee Carr, Adrian Dorsey, Kelly Miller, and Jason DeJesus stayed in Mr. Maddox's house at various times during the period that Rush was living there. (*Id.* at 1155:3–1156:20.) Mr. Rush was able to identify the voices of several defendants on wiretap recordings, including Messrs. Maddox (*e.g. id.* at 1255:21–1257:13), Carr (*e.g. id.*), Keith Paris Ruffin (*e.g. id.* at 1260:21–1262:20), and DeJesus (*e.g. id.* at 1284:18–1286:3). Mr. Rush testified that Mr. Ruffin dealt cocaine supplied by Mr. Maddox. (*Id.* at 1149:8–1150:17.) He testified that Mr. Carr started as a courier for Mr. Maddox before working his way up and eventually going out on his own, and that Mr. Carr later worked with Mr. Maddox in connection with a particular cocaine source in Orlando. (*Id.* at 1164:20–1166:15.) Mr. Rush testified that he met Messrs. Dorsey and Miller in New York before they moved to Tennessee to work in Mr. Maddox's drug operation. (*Id.* at 1167:8–1174:12.) Finally, Mr. Rush testified that Mr. DeJesus also came from New York to work in Mr. Maddox's operation for a period of time and that Mr. DeJesus had spoken with Mr. Maddox about cocaine connections in New York City. (*Id.* at 1189:16–1191:15.) All told, Jamie Rush left no doubt as to his deep knowledge of Sunnah Maddox's operation and the specific involvement of various individuals in that operation. Strikingly, in his three days on the stand, Mr. Rush did not so much as mention Ronnie Cooper.

4

On December 21, 2010, despite Mr. Rush's failure to inculpate Mr. Cooper and the weak evidence against Mr. Cooper generally, the jury returned a verdict of guilty on all five charges against Mr. Cooper. (ECF No. 638, Page ID # 3219–21.) Mr. Cooper filed a motion for a new trial on December 23 and a motion for acquittal on December 27, 2010. (ECF No. 643, Page ID # 3231–35; ECF No. 644, Page ID # 3236–42.) Both motions were denied on February 23, 2011. (ECF No. 705, Page ID # 6416–23.) Mr. Cooper was subsequently sentenced on September 29, 2011 to a term of 360 months. (ECF No. 841, Page ID # 7132.) The length of the sentence was driven in large part by the Court's application of the Career Offender Guideline under the Federal Sentencing Guidelines, U.S.S.G § 4B1.1(a), which applied solely due to the application of two non-violent offenses when Mr. Cooper was much younger. (ECF No. 808, Page ID # 6916–17.)

On November 30, 2012, Mr. Cooper appealed to the Sixth Circuit on a number of issues, including whether there was sufficient evidence for a rational jury to convict and whether the Career Offender Guideline should have applied where one of the two predicate offenses was a youthful offender adjudication under New York law. The Sixth Circuit affirmed his conviction in full on April 1, 2014. (ECF No. 930, Page ID # 8131–95.) Mr. Cooper filed a petition for panel rehearing on June 1, 2014, which was denied on July 22, 2014. (ECF No. 942, Page ID # 8259.) On October 20, 2014, Mr. Cooper filed a petition for writ of certiorari seeking Supreme Court review on the issue of whether a New York youthful offender adjudication qualifies as an adult conviction for purposes of the Career Offender Guideline. The Supreme Court denied the petition on December 1, 2014. (ECF No. 969, Page ID # 8627.)

## B. Post-Conviction Investigation

Following his unsuccessful appeal to the Sixth Circuit, Mr. Cooper retained Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss") on a pro bono basis. Paul, Weiss engaged the James Mintz Group, Inc. ("Mintz Group")—a private investigative group—to conduct a factual investigation, and the Mintz Group in turn engaged investigators Lois Colley for assistance in South Carolina and Mark Garner for assistance in Utica, New York. Through their efforts, the investigators were able to locate and ultimately interview Jamie Rush. After a preliminary phone call on October 10, 2015, Clancy Nolan of the Mintz Group and Lois Colley met with Mr. Rush in person on October 26, 2015 in Columbia, South Carolina to learn what he knew about Ronnie Cooper. (Nolan Aff. ¶ 4; Colley Aff. ¶¶ 4–6.)[1]

During their meeting, Mr. Rush told the investigators unequivocally that Mr. Cooper had nothing to with Sunnah Maddox's drug operation. (Nolan Aff. ¶ 5; Colley Aff. ¶ 7.) Moreover, Mr. Rush stated that he told law enforcement officials during pre-trial interviews that Mr. Cooper had no involvement whatsoever. (Nolan Aff. ¶ 7; Colley Aff. ¶ 8.) Mr. Rush told Ms. Nolan and Ms. Colley that he would consider signing an affidavit swearing to these facts, but that he needed to consult with his probation officer and obtain her approval before participating in any formal capacity. (Nolan Aff. ¶ 8; Colley Aff. ¶ 12.)

---

[1] References to "Nolan Aff." are to the Affidavit of Clancy Nolan dated November 24, 2015. References to "Colley Aff." are to the Affidavit of Lois Colley dated November 24, 2015. References to "Garner Aff." are to the Affidavit of Mark Garner dated November 23, 2015. References to "Ricker Aff." are to the Affidavit of William Louis Ricker dated November 24, 2015. References to "Markquart Decl." are to the Declaration of Andrew Markquart dated November 30, 2015.

A few days after that meeting, on October 30, 2015, Mr. Rush's probation officer, Jennifer Douglass, reached out to Clancy Nolan and said that Mr. Rush had asked her about signing an affidavit. (Nolan Aff. ¶ 9.) Ms. Douglass expressed various concerns to Ms. Nolan, which Ms. Nolan indicated she would pass along to Andrew Markquart at Paul, Weiss. (*Id.*) After learning of that conversation, Mr. Markquart attempted to contact Ms. Douglass by phone in order to address her concerns. (Markquart Decl. ¶¶ 7–8.) On November 9, 2015, Ms. Douglass returned Mr. Markquart's call and expressed similar concerns to those she had previously expressed to Nolan, including that Paul, Weiss was not yet listed as Mr. Cooper's attorney of record on PACER. (*Id.* ¶¶ 9–10.) Mr. Markquart offered multiple ways of demonstrating that Paul, Weiss was in fact representing Mr. Cooper, none of which satisfied Ms. Douglass. (*Id.* ¶ 10.) In addition, Ms. Douglass expressly stated that, even if Paul, Weiss were counsel of record, she would never allow Mr. Rush to cooperate with this investigation because of the nature of the crimes for which Mr. Cooper was convicted. (*Id.* ¶ 11.) After some back and forth, Mr. Markquart asked her for purposes of clarity whether she would be advising Mr. Rush not to cooperate with the investigation, or whether she would be instructing him not do so. (*Id.* ¶ 12.) She responded that she would be instructing him not to participate. (*Id.*)

The statement from Mr. Rush that Mr. Cooper was not involved in the drug operation is not reflected in anything that the prosecution turned over in discovery, and Mr. Cooper's trial counsel, William Louis Ricker, has confirmed that this critical evidence was never disclosed to him. (Ricker Aff. ¶¶ 4–5.) This failure to disclose

exculpatory and highly material evidence deprived Mr. Cooper of due process and requires that his conviction be vacated.

**ARGUMENT**

Ronnie Cooper was convicted and sentenced to 30 years in prison following a conspiracy trial in which he was never told that the prosecution's star witness provide the government with information that exonerated Mr. Cooper in full. The prosecution's failure to disclose this critical evidence goes to the very core of the Supreme Court's holding in *Brady* v. *Maryland* that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). While *Brady* itself addressed a scenario where defendant's counsel had specifically sought and been denied access to certain extrajudicial statements, the Court made clear in subsequent rulings that the rule from *Brady* applies equally whether or not a defendant ever requested the evidence in question. *See, e.g., United States* v. *Bagley*, 473 U.S. 667, 682 (1985) (holding standard is the same whether the defense made no request, a general request, or a specific request for the evidence in question). So long as the evidence in question is both favorable to the defendant and material, it must be disclosed under *Brady*.

**A.  Mr. Rush's Statement Should Have Been Disclosed Because It is Both Exculpatory and Material.**

The requirements that the undisclosed evidence be favorable to the defense and material are both easily satisfied here. Mr. Rush's statement that Mr. Cooper was not involved in the drug operation is obviously favorable to Mr. Cooper given that it exonerated him. Indeed, it is difficult to conceive of evidence that could be more

favorable than a statement from a cooperating defendant who was a member of the conspiracy that Mr. Cooper was not part of that conspiracy. This is particularly so in light of Rush's commitment in his plea agreement "not to protect anyone who was truly involved and not to falsely implicate anyone who was not truly involved in the commission of criminal offenses." (ECF No. 433, Page ID # 2302.)

The evidence is also highly material. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* There can be no question that the evidence in question here was material given that all of the charges against Mr. Cooper related to his alleged participation in a drug operation, and Rush said he was not a part of that operation. Although the evidence here clearly would have been enough to swing a jury, the Supreme Court has made it clear that the "reasonable probability" standard does not require a showing that it is more likely than not that the defendant would have been acquitted had the evidence been disclosed:

> Although the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant). . . . The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

*Kyles* v. *Whitley*, 514 U.S. 419, 434 (1995). Similarly, the standard for materiality does *not* require a showing that, once accounting for the undisclosed evidence, there would not have been sufficient evidence for the jury to convict. *Id.* at 434–35. "If consideration of

the additional evidence shakes the court's confidence in the verdict, a new trial should be ordered even if there remains sufficient evidence to sustain a conviction." *Tavera*, 719 F.3d at 713. Thus, the burden is not on Mr. Cooper to prove that he would have been acquitted had Rush's statement been disclosed. Mr. Cooper only needs to show that there is a reasonable probability that he would have been acquitted, a standard that is easily satisfied here.

The decision in *United States* v. *Tavera*, which, as already noted, involved the same prosecutor who handled Mr. Cooper's case, is highly informative. In that case, defendant Mr. Tavera was charged with and convicted of participating in a conspiracy to distribute methamphetamine after the truck he was riding in from North Carolina to Tennessee was discovered to have a large quantity of methamphetamine hidden under construction equipment. 719 F.3d at 707. Mr. Tavera testified at trial that he was unaware that the drugs were in the truck and that he believed he was going to Tennessee for a roofing job. *Id.* After being convicted, Mr. Tavera learned that his codefendant Mr. Mendoza, who was the one driving the truck, told Assistant U.S. Attorney Donald Taylor during plea negotiations that Mr. Tavera had no knowledge of the drug conspiracy. *Id.* Mr. Taylor never conveyed this information to Mr. Tavera despite that, as the Sixth Circuit noted, the statement was "plainly exculpatory." *Id.* at 708. The court held that the statement was exculpatory even though Mr. Mendoza's story changed over time, and he ultimately testified that Mr. Tavera did know of the drugs. *Id.* at 714. In finding that it was reasonably probable that the disclosure of Mr. Mendoza's statement could have led to a different result, the Sixth Circuit reasoned that "considering the circumstances in which his statements were given, a juror may have believed he was telling the truth at

first rather than after he had negotiated a guilty plea with the government." *Id.* at 713. The Sixth Circuit ultimately vacated Mr. Tavera's conviction and stated that "[t]his particular case is not close." *Id.* at 708.

The immediate case parallels *Tavera* in many respects, and where the two cases diverge, Mr. Cooper's case presents an even stronger argument for finding a *Brady* violation. Here, as in *Tavera*, Assistant U.S. Attorney Donald Taylor has failed to disclose a statement from an alleged coconspirator that the defendant was not a party to the conspiracy. Just as in *Tavera*, Mr. Rush's statement that Mr. Cooper was not involved is "plainly exculpatory." *Id.* And just as in *Tavera*, there is a reasonable probability that disclosure of this statement would have resulted in a different outcome. If anything, the chances of a different outcome would have been even greater in Mr. Cooper's case because, unlike Mr. Mendoza in the *Tavera* case, Mr. Rush never changed his story as to Mr. Cooper's guilt. Like in *Tavera*, the case here is not a close call. Mr. Cooper's case demands the same result as that reached in *Tavera*, and his conviction should be vacated.

### 1. Mr. Rush's Statement, If Disclosed, Would Have Severely Undermined the Prosecution's Case.

The undisclosed evidence in question here is plainly material. Had Mr. Rush's statement of Mr. Cooper's non-involvement been disclosed, there is at the very least a reasonable probability that Mr. Cooper would have been acquitted. In fact— although Mr. Cooper is not required to make any such showing—it is highly likely that Mr. Cooper would have been acquitted had this come to light. This is particularly true given that Mr. Rush's statement does not contradict anything else he testified to at trial.

So, unlike in cases where a witness recants his prior testimony, introducing Mr. Rush's statement of Mr. Cooper's innocence would not have diminished his credibility.

It is difficult to overstate how dramatically Mr. Rush's statement would have shifted the case against Mr. Cooper. As noted above, Mr. Rush demonstrated through his testimony that he was highly knowledgeable of all aspects of Sunnah Maddox's drug operation, and he provided detailed testimony against every other defendant besides Mr. Cooper. If his statement that Mr. Cooper was not involved had been introduced at trial, the jury would have had no choice but to take that seriously. That Mr. Rush was located in Tennessee while Mr. Cooper was in Utica, New York does not diminish the impact of Mr. Rush's statement. Mr. Rush did not merely tell the government that he was unaware of Mr. Cooper's involvement. He affirmatively stated that Mr. Cooper was not involved. Based on Mr. Rush's level of involvement in the operation, he almost certainly would have known if Mr. Cooper was involved in any way. Mr. Rush knew, for instance, that Adrian Dorsey and Kelly Miller had come from Utica to Tennessee to work in Mr. Maddox's drug distribution ring. (Trial Tr. 1167:24– 1169:10; 1170:15–1170:24; 1174:6–12.) There can be little doubt that having a core member of Mr. Maddox's team affirmatively testify as to Mr. Cooper's non-involvement would have sunk the prosecution's case.

**2.      The Evidence Against Mr. Cooper Was Comparatively Weak Such that the Result Likely Would Have Been Different Had Mr. Rush's Statement Been Disclosed.**

Conversely, there was no evidence presented against Mr. Cooper that comes anywhere close to matching the potency of Mr. Rush's statement. The most direct evidence against Mr. Cooper came from two jailhouse informants, both of whom had strong incentives to lie in order to lower their own sentences, and both of whose

testimony contained gaping flaws. The other evidence consisted of certain text messages, phone calls, and wire transfers, all of which indicated at most that Mr. Cooper was a marijuana user and had some relationship with his brother-in-law—hardly indisputable indicators of culpability. Stacking up all the evidence presented at trial, it is at the very least reasonably probable—if not *highly* probable—that introducing Mr. Rush's statement of Mr. Cooper's non-involvement would have resulted in a different outcome.

a.     <u>Jailhouse Informants</u>

The only direct evidence of Mr. Cooper's guilt that the prosecution introduced came from two highly questionable jailhouse informants. First, Daniel Ballinger testified that he had spent a total of three weeks in jail with Mr. Cooper and that during that time they had grown sufficiently close that Mr. Cooper had divulged to him that he was a key member of a drug ring that distributed crack and cocaine and that he was using his job at a gas station as a cover for his drug sales. (Trial Tr. 634:4–645:7.) The utter implausibility of Mr. Ballinger's testimony is heightened by the fact that, contrary to his testimony, the two men only overlapped for a total of about eight days between two different jails. (*Id.* at 652:6–11.) Indeed, the Court even acknowledged the inconsistencies in Ballinger's testimony in its decision denying Mr. Cooper's motion for a new trial. (ECF No. 705, Page ID #6422.) Even if Mr. Cooper were guilty, the suggestion that he would have confessed his guilt so openly to a person he knew for a matter of days while his case was pending is questionable to say the least. Of course, Mr. Ballinger's testimony calls for heightened suspicion given his status as a jailhouse informant with much to gain by testifying against others. *See, e.g., Zappulla* v. *New York*, 391 F.3d 462, 470 n.3 (2d Cir. 2004) ("Several reports have found that jailhouse informants have a significant incentive to offer testimony against other defendants in

order to curry favor with prosecutors and that the proffered testimony is oftentimes partially or completely fabricated. Thus, the use of jailhouse informants to obtain convictions may be one of the most abused aspects of the criminal justice system." (internal quotation omitted)).

Second, Trewayne Sanders, another jailhouse informant testifying pursuant to a plea bargain, testified that he had been with his stepfather, Odum Shealey, on multiple occasions when Mr. Shealey purchased powder cocaine from Mr. Cooper at the Citgo station in Utica where Mr. Cooper worked. (Trial Tr. 1890:12–1893:16.) Mr. Sanders' testimony was eviscerated when Mr. Shealey, a man with no skin in the game at all, voluntarily took a lengthy bus ride from Syracuse, New York to Greenville, Tennessee in order to testify for the defense. (*Id.* at 2364:19–2365:5.) While Mr. Shealey admitted upon cross-examination that he had used cocaine in the past, he categorically denied that he had ever purchased cocaine from Mr. Cooper. (*Id.* at 2365:18–23, 2368:12–21, 2372:5–2373:22.) Moreover, Mr. Shealey said of Mr. Sanders, "He can't be believed, he can't even be trusted, and that is my stepson, and I hate to say that, but it's the truth." (*Id.* at 2371:3–5.) Thus, Mr. Sanders' testimony was at least neutralized by the contradictory testimony from Mr. Shealey, a witness who, unlike Mr. Sanders, had nothing to gain from his testimony.

### b. Text Message Exchanges

None of the three text message exchanges between Mr. Cooper and Mr. Maddox introduced at trial themselves suggest that Mr. Cooper was participating in Mr. Maddox's operation. Two of the exchanges include what appear to be cryptic references to marijuana ("AZ"). (Gov't Trial Ex. 81 at 2, 3–4; Trial Tr. 829:11–833:9.) In his testimony concerning these messages, Agent Brian Vicchio of the Johnson City Police

Department was only able to extract meaning concerning a quantity as to one of the exchanges. There, Agent Vicchio interpreted the exchange as Mr. Cooper asking Mr. Maddox for the price of a quarter ounce of marijuana, with Mr. Maddox responding that it would be $390 because it was $1,550 for a full ounce. (Gov't Trial Ex. 81 at 2; Trial Tr. 830:25–831:18.) Mr. Cooper has never denied using marijuana personally. A quarter ounce of marijuana is an amount entirely consistent with personal use and in no way indicative of participation in a distribution ring. *See United States* v. *Woods*, 26 Fed. App'x 448, 451 (6th Cir. 2001) (finding possession of 7.5 grams (about 0.26 ounces) of marijuana consistent with personal use).

The third text message exchange is perhaps the most cryptic with references to "dat other ting" and "eleven dollar joint." (Gov't Trial Ex. 81 at 5–6; Trial Tr. 833:10–835:16.) Agent Vicchio testified that in his opinion the "other ting" was a reference to cocaine since they had previously been discussing marijuana and that an "eleven dollar joint" was referring to $1,100 for an ounce of cocaine. (Trial Tr. 833:23–835:15.) However, upon cross-examination, Agent Vicchio did not deny the possibility that an "eleven dollar joint" could plausibly be a dollar blunt stuffed with ten dollars' worth of cheap marijuana. (*Id.* at 892:21–893:20.) Thus, while these text message exchanges appear to reference drugs of some kind, they do not themselves indicate Mr. Cooper's participation in the drug operation.

c.      Recorded Phone Calls

During trial, the prosecution introduced recordings of two phone calls against Mr. Cooper. The first call, Session 11615, involved a cryptic exchange that Vicchio interpreted as having something to do with drugs. Agent Vicchio interpreted the call as Mr. Cooper asking what the price for something would be and saying that he was

good for the moment but that he would let Mr. Maddox know later if he needed anything. (*Id.* 826:13–828:13.)  Aside from the substance of the call being extraordinarily vague, there was compelling evidence presented at trial to suggest that it was not even Mr. Cooper on that call.  First, the phone number involved was 315-507-4113.  (Transcript Book at 69.)  This is a different number than the primary number identified by the prosecution for Mr. Cooper, 315-514-1664.  (Trial Tr. 1780:21–25 (testimony of Ken Johnson).)  Also, two separate witnesses who worked with Mr. Cooper at the Citgo station in Utica testified that it was not Mr. Cooper's voice on the call.  (Trial Tr. 2313:10–2314:15 (testimony of Steven Moynihan), 2345:13–2347:4 (testimony of Robert Graham).)

Information obtained during the post-conviction investigation for this case provides further evidence that Mr. Cooper was not on this call.  The investigators from the Mintz Group were able to determine that the phone number 315-507-4113 belonged to Walt Wilson.  When investigator Mark Garner met with Mr. Wilson at his home in Utica on October 16, 2015, Mr. Wilson confirmed that this had been his and his wife's home phone number.  (Garner Aff. ¶¶ 3–4.)  Mr. Wilson told Mr. Garner that he did not even know Mr. Cooper and that that he never let Mr. Cooper use his phone.  (*Id.* ¶ 5.)  Mr. Wilson told Mr. Garner that he was never interviewed by law enforcement in connection with this case.  (*Id.* ¶ 6.)

The second recording introduced against Mr. Cooper at trial was of a three-way call on April 24, 2010 that Connie Cotton placed to connect Mr. Maddox, who was in jail at the time, to Mr. Cooper.  Before Mr. Maddox called Mr. Cooper, he left a threatening message on Mr. Rush's voicemail.  (*Id.* at 1655:14–1656:22.)  Mr. Maddox

then had Ms. Cotton call Mr. Cooper, to whom Mr. Maddox went on a rant about Jamie

Rush. (*Id.* at 1656:24–1661:1.) Most notably, Mr. Maddox said, "Green light on him,"

which FBI cryptanalyst Betsy Ulibarri testified is typically used to authorize harming or

killing someone. (*Id.* at 1721:15–1722:21.) In response, Mr. Cooper did not indicate that

he would do anything to Mr. Rush. He simply responded, "Yeah?" (*Id.* at 1657:23–24.)

Throughout the conversation, Mr. Maddox was the one doing most of the talking, with

Mr. Cooper listening and indulging Mr. Maddox in his rant but at no point indicating any

affirmative agreement to actually harm Rush. The prosecution did not introduce any

further evidence that Mr. Cooper took any actions whatsoever in furtherance of any kind

of agreement to harm Mr. Rush. Moreover, when Mr. Rush met with investigators

Clancy Nolan and Lois Colley, he told them that he never feared that either Mr. Maddox

or Mr. Cooper had any intent to harm him, even after learning of that phone call. (Nolan

Aff. ¶ 6; Colley Aff. ¶ 9.) He told the investigators that Mr. Maddox was prone to blow

off steam and that if he were actually in danger he would have been placed into protective

custody. (Nolan Aff. ¶ 6; Colley Aff. ¶ 9.)

        d.    <u>Wire Transfers</u>

        Finally, in support of the count against Mr. Cooper for conspiracy to

commit money laundering, the prosecution introduced evidence of a single $900 Western

Union wire transfer to Mr. Cooper from Mr. Maddox. (*Id.* at 1965:14–17, 1985:3–

1987:8.) The prosecution did not introduce any specific evidence suggesting that this

money was used to further the alleged conspiracy. To the contrary, Mr. Cooper put on

evidence to show that the money went to pay for work that had been done on his car

earlier that month. (*Id.* at 2337:6–2339:20 (testimony of David Bailey); Cooper Trial Ex.

8 (work order from Bailey's Automotive).) The prosecution also insinuated that 22 wire

transfers over the course of nearly four years totaling $8,560 that Mr. Maddox made to his sister and Mr. Cooper's wife, Kizzy Luckerson, were in fact intended for Mr. Cooper. (*Id.* at 1965:18–1966:2, 2500:1–7.) The prosecution introduced no specific evidence in support of that theory or to contradict the more straightforward and benign possibility that Mr. Maddox was simply sending money to his sister to help out with ordinary life expenses.

In short, the evidence presented against Mr. Cooper at trial was thin by any measure. Even acknowledging this Court's prior ruling that there was sufficient evidence such that a rational jury could convict, the evidence was far from overwhelming. There is good reason to believe that Mr. Cooper fell victim to the well-recognized risk of spillover prejudice that is particularly acute as to minor defendants where there is overwhelming evidence of guilt presented against other codefendants. *See, e.g., United States* v. *Gallo*, 668 F. Supp. 736, 750 (E.D.N.Y. 1987) ("Inevitable prejudice to the peripheral defendants is caused by the slow but inexorable accumulation of evidence against the major players. . . . Where the evidence against the 'minor' defendants is so little or so vastly disproportionate in comparison to that admitted against the remainder of the defendants, the likelihood of spillover prejudice is greatly enhanced. The courts must be scrupulous to avoid the spectre of guilt by association—or, more likely, guilt by confusion." (internal quotations and citations omitted)).

When examined in light of the newly uncovered statement from a highly knowledgeable member of the Sunnah Maddox drug operation that Mr. Cooper was not involved, it can hardly be said that this was "a trial resulting in a verdict worthy of confidence." *Kyles* v. *Whitley*, 514 U.S. 419, 434 (1995). It is almost inconceivable that

a jury presented with Mr. Rush's statement of Mr. Cooper's innocence would have convicted in light of the remaining evidence. Because there is at the very least a "reasonable probability" that the result would have been different had Mr. Rush's statement been disclosed, the evidence is obviously material and should have been disclosed without thinking twice. *United States* v. *Bagley*, 473 U.S. 667, 682 (1985). Because it was not disclosed, Mr. Cooper's sentence should be vacated. Indeed, even had it been disclosed, it would still be the case that Mr. Cooper's sentence should be vacated. Had evidence of Rush's statements concerning Mr. Cooper's lack of involvement in the Sunnah Maddox drug operation been turned over to Mr. Cooper's trial counsel, then the failure of Mr. Cooper's counsel to cross-examine Mr. Rush on that basis would plainly amount to constitutionally ineffective assistance of counsel, and Mr. Cooper's conviction should be vacated on that basis. *See, e.g. Higgins* v. *Renico*, 470 F.3d 624, 633 (6th Cir. 2006) (holding that defense counsel's decision not to cross-examine the prosecution's key witness on prior statements contradicting the prosecution's theory amounted to ineffective assistance of counsel).

**B.** **Mr. Rush's Statement Should Have Been Disclosed Even if It Could Have Been Discovered with Due Diligence.**

The law is clear that defense counsel has no obligation to engage in due diligence to uncover exculpatory evidence that the prosecutors may possess. *See Banks* v. *Dretke*, 540 U.S. 668, 696 (2004) ("A rule thus declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process."); *United States* v. *Tavera,* 719 F.3d 705, 712 (6th Cir. 2013) (citing *Banks* and other Supreme Court precedents, and rejecting rule imposing due diligence requirement on defendant). Therefore, even if it were the case that Mr.

Cooper's trial counsel might conceivably have learned the substance of Mr. Rush's exculpatory statement to law enforcement officials, through cross-examination at trial or otherwise, that would not change the analysis. The only question under *Brady* is whether the evidence is favorable to the defendant and material. Once again, that standard is indisputably satisfied.

### C. Mr. Rush's Statement Should Have Been Disclosed Whether It Was Made to Police or to the Prosecutors.

Moreover, application of the *Brady* rule does not require that a prosecutor was personally in possession or even aware of the undisclosed evidence. The Supreme Court has held that "the rule encompasses evidence known only to police investigators and not to the prosecutor." *Strickler* v. *Greene*, 527 U.S. 263, 281 (1999) (internal quotation omitted); *see also Harris* v. *Lafler*, 553 F.3d 1028, 1033 (6th Cir. 2009) ("Brady thus applies to relevant evidence in the hands of the police, whether the prosecutors knew about it or not, whether they suppressed it intentionally or not, and whether the accused asked for it or not." (internal citation omitted)). "In order to comply with *Brady* therefore, the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." *Strickler*, 527 U.S. at 281 (internal quotation omitted).

Based on the evidence currently available, without the benefit of any discovery, it is unclear specifically who in law enforcement Mr. Rush informed of Mr. Cooper's non-involvement. The legal standard is such, however, that this does not matter. Mr. Rush testified at trial that he met with Agent Brian Vicchio of the Johnson City Police Department on approximately ten to fifteen occasions prior to testifying and that Agent Tracey Alexander of the United States Drug Enforcement Agency and Agent

Vincent Walters of the Washington County Sheriff's Office were present at some of these meetings. (Trial Tr. 1573:2–1574:16.) Rush further testified that he met with Assistant United States Attorneys Donald Taylor and Robert Reeves on approximately four or five occasions prior to his testimony. (*Id.* at 1574:17–1576:7.)

When interviewed for purposes of the investigation leading up to this motion, Mr. Rush could not recall who specifically he told that Mr. Cooper was not involved with Maddox's drug operation. (Nolan Aff. ¶ 7; Colley Aff. ¶ 8.) This is not at all surprising given the number of times he was interviewed prior to trial and the more than five years that have passed since then. The important thing is that he stated unequivocally that in the course of his pre-trial interviews with law enforcement that he informed them that Mr. Cooper had nothing to do with the Maddox drug ring. Whether he said this to Agent Vicchio or Mr. Taylor, the result is the same. The evidence was textbook *Brady* material that should have been disclosed to Mr. Cooper and his attorney.

## CONCLUSION

For the reasons set forth herein and in the accompanying motion, Ronnie Cooper respectfully asks this Court to grant his motion to vacate and set aside his sentence pursuant to 28 U.S.C. § 2255.

Dated: New York, New York
       November 30, 2015


PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP


By: /s/ Jaren Janghorbani

Jaren Janghorbani*
Andrew Markquart*
Thomas Christman Rice*
1285 Avenue of the Americas
New York, NY  10019-6064
Telephone:  (212) 373-3000
Fax:  (212) 757-3990
jjanghorbani@paulweiss.com
amarkquart@paulweiss.com
trice@paulweiss.com


*Admitted *pro hac vice*

*Attorneys for Movant Ronnie Cooper*

BERNSTEIN, STAIR &MCADAMS
LLP
Nathaniel Evans
116 Agnes Road
Knoxville, TN 37919
Telephone:  (865) 546-8030
Fax:  (865) 522-8879
nevans@bsmlaw.com

LAW OFFICES OF BRYAN E. DELIUS
Bryce W. McKenzie
124 Court Avenue
Sevierville, TN 37862
Telephone:  (865) 428-8780
Fax:  (865) 428-5254
bryce@bryandelius.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 30, 2015, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

  /s/ Jaren Janghorbani
Jaren Janghorbani
Paul, Weiss, Rifkind, Wharton & Garrison LLP